I'm Dan Hartzog, Raleigh, North Carolina. Together with my partner, Carrie Johnson, we appear in the case for the defendants who originally were the Town of Chapel Hill, James Wilde, Randy Mason, Leo Vereen, Christopher Blue. At this point in the case, Judge Schroeder has granted summary judgment on 12 of the 17 claims that were initially filed by the plaintiff. And why was summary judgment denied on the remaining? On the remaining claims? Yes. The indication in Judge Schroeder's opinion was that he found there were genuine issues of material fact, and we do not believe, Your Honor, that there were genuine issues of material fact. But if that was the basis for the determination, what makes this an appealable collateral order? I'm sorry? What makes this an appealable collateral order if summary judgment was denied on the basis of the existence of disputed fact? It's immediately appealable, we believe, Your Honor, because of the issues of qualified immunity and public official immunity, which are immediately appealable. Only where the determination rests on a legal finding, which does not appear to be the case here. I understand what Judge Schroeder has said, but I would like to point out how I believe that what he has said actually is that he believed, you know, the genuine issues of material fact that he set forth were basically what Officer Wilde told the magistrate, which really actually is not in the record because there wasn't any testimony or affidavit or anything taken from the magistrate. But if you look at the actual facts of the case, there really is no dispute. And the plaintiff in his brief says there's no dispute of facts. I thought that the foundational difficulty here for Judge Schroeder, which I think takes you immediately to the questions Judge Duncan posed, is I understand the record. In order to determine whether or not the officer had probable cause to obtain these warrants, it depends upon what version of the events of this particular day are believable. What would a jury determine were the facts that happened that day? And as I understand his opinion, he determined that if you believe your client's version of events, he was surrounded by these folks and intimidated and that justified the warrants that he got, then there would have been probable cause. On the other hand, if a jury disbelieved him and believed the account made by the other individuals that day, that it was just a calm meeting, then there would not have been probable cause. I mean, it seems like to me that's the quintessential factual issue that we don't have jurisdiction to determine in an interlocutory appeal in a qualified immunity. Well, the interesting thing, Your Honor, is that the facts actually are undisputed, and we understood when we moved for summary judgment that the facts would be taken in the light most favorable to the plaintiff. So we're willing to live with the plaintiff's facts and say, okay, these are the facts. And truthfully, if you read the record and the depositions, the facts are really honestly undisputed. The characterization of the facts is the only difference. One person says surround, one person says ban, one person says scattered, that sort of thing. But there really is no issue of fact here. But I'm not sure how we can accept that in the face of the district court's characterization that summary judgment was inappropriate. And that was what his determination turned on. And a claim of qualified immunity is only appealable to the extent that it turned on an issue of law. I can simply point out that the parties to the case and the evidence in the case does establish that while there was a characterization of the facts used in different words, it really was semantics. The words that people used were different than the descriptions, and the perceptions may have been different than the facts. Well, Judge Schroeder didn't see it as simply semantics. He said if we look at the set of facts in one light, there is probable cause. But if a jury doesn't believe that set but believes the other set, then there is a probable cause. I don't see how you get away from the basic factual dispute. Again, I understand, Your Honor, and I understand Your Honor's point. And I'm standing here knowing that Judge Schroeder has said that, but knowing from reviewing the record and seeing what the parties have said, that I know this is not a factual dispute. It's a matter of law. But there's an answer to, I think, Judge Duncan and Judge Agee's question, and I think it's critical for you to answer it. And it's not for me to answer it for you, but may I suggest that you might be suggested that, notwithstanding the district court judge said it turned on facts, that you are urging us that even if you take the two things that he said that was in question, even if you resolve them, no matter how you resolve them, it comes to a legal question, if that is the case, and that he's wrong that it's a fact question, but you'd have to assume all of those facts and make sure that all those facts are pertinent. Now, where they were located, is that undisputed to other persons? Your Honor, I believe that it is, and that's what I tried to say. So that's undisputed. Yes, sir. It doesn't matter if one person called that surround or close by. The question is what a reasonable officer could have and would have assumed under those circumstances. Yes, sir. I think that's what you're saying, that that's not a fact question. That's a question of law in a sense. But there's another one, though. What about your client is saying that I didn't tell the magistrate what they said I told them, even though it's in the document, in the affidavit. What about that fact? It's in the affidavit that was submitted to the magistrate. Right. So would you have to concede that your client told the magistrate exactly what was written there? Actually, no. I mean, what was submitted to the magistrate we understand, and what the warrant says we understand. But given all of that, it simply does come down to a matter of law to qualify immunity in the objective officer's reasonable perception. And we believe that because probable cause exists for all of this, that probable cause, every single claim of the plaintiff relies upon the claims rise and fall on the existence of probable cause.  Right. What constitutes probable cause is not based upon what's in the affidavit or what he told the magistrate. It's what a reasonable officer would have believed was there was probable cause. Your argument is that's a legal question. Yes, sir. That's exactly right. And we believe that probable cause existed in this case and qualified immunity exists for the officer in this case because in this case, after this incident occurred, the officer having been confronted in this fashion, he could have arrested Mr. Swick right there. He didn't. He went back and talked to Boreen, his supervisor, told him what happened. Boreen goes to the magistrate and talks to him. The next day or two days later,  that warrant then at that point goes to the prosecutor who at some point dismisses one of the charges, the communicating threats charge. So he considered that, and he did not dismiss the intimidation charge. And that goes forward, and there's a document in the record where Judge Coleman, district court judge in Orange County, says I find probable cause for the intimidation of witness. If that goes forward and the DA tries that case, it goes to the jury. There's a motion to dismiss at the close of the state's evidence. There's a motion to dismiss at the close of all of the evidence, and the district court judge denies those motions, clearly finding probable cause, and it goes to the jury. And Mr. Swick is acquitted by the jury of those charges, but that's the last time that he gets away from that. And we believe as a matter of law that that establishes probable cause, and that certainly supports qualified immunity and public official immunity for Officer Wah. I've not seen a single case that went all the way to a jury trial on the charge where there was a finding that there was a probable cause. We believe that establishes it as a matter of law. All of those people looked at it and found probable cause. And I, again, think that these facts, when you look at what happened there at the pool and what went on and what both sides said, there really is no dispute of any material fact. There may be a dispute about, you know, how people perceived it or the words that they used in describing it, but there certainly is no dispute. I took the depositions of the plaintiff and every one of his friends, and we absolutely agree those are facts. And on those facts, the officer had a reasonable belief that a probable cause existed for intimidation of witness, and we went from there, and that's where the case went. What's the evidence of the threat? Well, interestingly, the plaintiff in this case wants to say, well, you had to say something, and the statute says basically any other means or any method of intimidation. So what is the factual threat, then, since it was nonverbal? The factual threat, really, you have to take the circumstances as a whole and put this into context of where it was going on. You've got what was described at one point in Judge Schroeder's decision as this happened at a family pool where children were playing. Well, that's not where this happened. They left the pool. Officer Weil went to the pool to swim on his break, saw these individuals pointing at him, talking about him, and he decides he should leave. And Runfola, the friend of Mr. Swick, says, well, thank goodness, no confrontation today. And then he tells and Mr. Swick says, I want to talk to him. I want to confront him. I want to talk to him. And Runfola says, that's not a good idea. They've been drinking all day. They've been out in the pool drinking. There's no contest about that. Swick and at least some of his friends have been drinking all afternoon, and they decide this is the time they're going to follow Officer Swick. He decides to leave, to get away. He sees them pointing at him, talking about him, and he leaves. And they follow him 100 yards, the length of the football field, from the pool over to his apartment. And he says they fan out, and Gopalakrishna, one of the friends of the plaintiff, says, he describes it. It's on page 889 of the joint appendix. He draws a little diagram of where they are. It's 75 feet away, some group, right? Well, 50 feet or somewhere thereabouts. But he says that, you know, Swick is right there up at him against his car, and there's one here and two, three here. And you look at where they are, and it's this triangle, and it's a fan. So we can quibble with the word choice of whether they were fanned out or whether they were scattered, as Gopalakrishna says, but they were in the same location. And, you know, he felt intimidated, and Carlos Alvarado, who's one of the friends who testified at the criminal trial and in his deposition in our case, I could see how that would be intimidating. And there's no question that Weil found it intimidating because he went back in and called Randy Mason and was very upset. He goes to see Vereen. Vereen says he's shaken, he's never heard anything like that. And Vereen says, Where I come from, four or five people come to follow you 100 yards, and, you know, they're not coming to say hello, have a nice day. It just was intimidating. Here I'm reading from the opinion. Here the undisputed facts reveal that Swick simply discussed the May 20th arrest warrant with Weil ostensibly in an attempt to clear the air. He's saying, Why are you picking on me, in essence? Swick began the conversation by asking if he could speak with Weil. The witnesses agree that Weil and Swick conversed on a first-name basis, were calm throughout the conversation, did not raise their voices. Neither man displayed any threatening gesture. Weil also concedes that none of Swick's statements could be construed as threatening. Further, Weil admits that when he decided to end the conversation, no one attempted to or did prevent him from leaving. After, and so on. None of the men were closer than 15 or 20 and perhaps as far as 75 feet away. There was no verbal threat. And Swick's rendition of the physical arrangement, all of the men, all of whom were in swim attire and were either barefoot or wearing flip-flops, would indicate that they kept their distance under a tree and thus did not reasonably represent a threat of physical harm. I can only say that Officer Weil, and I would agree with him, if I were at a swimming pool and four or five guys are pointing at me and talking to me and I know that I'm the witness in a criminal trial that's coming up where he's charged with DWI, and they start pointing at me and then I leave the pool to avoid a confrontation and they follow me and they follow me 100 yards to where I live. And I get in the car and leave because I want to get away. And then I think, well, maybe they weren't doing that. Maybe they weren't following me. And so I come back and they're still there. And the truth of the matter is they were following him and they all say they were following him and there's no dispute about they were following him. These guys who've been out here drinking at this pool for four or five hours that day followed him with the idea to confront him. And Ron Foley's like, you know, please don't do this, Swick. This is not a good idea. I mean, this is exactly what was going on. And you have to get the flavor of what was happening there to understand this and the actual words and trying to describe it and using different words to describe it. It's not fair to Wilde, who is entitled to have this objectively reasonable perception that this is what's going on. He believes that they are trying to intimidate him and exactly what Swick wanted to talk to him about was this charge. Why are you throwing me under the bus? Why are you all picking on me? And there was this personal relationship that actually Wilde was not really involved with. He knew a couple of these people, but he didn't know them well. They really knew his girlfriend, now his wife. And I think that it's clear that Swick had a belief that, hey, look, we know each other from the pool out here. You need to kind of cut me a break. You know, if you see me driving drunk or driving without my license, I mean, how about just letting me go? We're friends. And they looked at it like, in fact, the discussion that he had with Wilde that day. Why are you throwing me under the bus? Why are you targeting me? What are we doing here? And Wilde said to him, you know, you need to stop breaking the law. And that's what that conversation was about. So he did discuss it with him. And so I think, you know, Wilde Swick would like him to say, look, we're friends. Don't worry about what you do. It's fine. You know, I know you from out here. You don't have to worry about, you know, the traffic laws and the DWI laws. And the officer saw it a different way and he didn't appreciate that. And I think that's certainly a factor in this. But when questioned, every one of these people, I asked them questions. Did you think that was what was going on? Did you think this was because of the relationship? No, no, no, no, no. And one of them looked kind of, well, you know, maybe. But then he later said, well, I don't know. Swick said, no, that's not what it was. Runfola said, no, it had nothing to do with that. So they don't really claim that it's that. But we know that issue is out there. And we know that was in the back of their mind. And we know that's what people were thinking when they followed him from the pool. And I think the guy sincerely believed, and it's very clear from seeing him and looking at the testimony, this is what he thought. And he goes to Vereen and they go to the magistrate and two judges look at it and it goes all the way to a jury trial. It passed two motions to dismiss at the close of the state's evidence and the close of all the evidence. And if that isn't probable cause, I don't know how it's going to be looked at. So I think that's the case. You've answered Judge Duncan's question. Are you going to eat into your rebuttal? I'll save my time. Okay. Thank you very much. It's extra. Your Honors, may it please the Court. My name is Bob Ekstrand. I'm here on behalf of the plaintiff in this case, Dr. Lance Sweck. Your Honors, I'd like to dive right in to exactly the issue that you've raised, and I think it comes in two parts. The first is whether or not the question of qualified immunity is always a legal one, and if not, what is the appealability of an order based on a current issue? The related question, of course, is that the qualified immunity issue is all wrapped up in probable cause and whether or not probable cause existed. Do you agree that the facts are not in dispute? No. So if that's the case, do we have jurisdiction to hear this appeal? In my view, no. This Court has held, and the District Court noted, that qualified immunity can be a factual issue at step one, and if there are disputed facts embedded in the qualified immunity question, then those are to be resolved by a jury. What salient facts are in dispute? I'm sorry, Your Honor? What salient facts are in dispute? Well, let me put it to you this way. Mr. Wilde told, there is testimony in the record about what Mr. Wilde told the magistrate and what Mr. Wilde failed to tell the magistrate. I'll just point you to Joint Appendix 585 to 587 for some of the omissions. But the clearest account of what Mr. Wilde was saying in the aftermath of his conversation with Dr. Swig was reported twice, once at the criminal trial and once in depositions in this case. You don't have a lot of time, so you may want to get to my question. That is, what salient facts are in dispute? The salient facts are that Mr. Wilde contends and told the magistrate and his supervisor that several men unknown to him followed him from the pool, fanned out, surrounded him, cut off his escape, while Dr. Swig talked to him about his pending criminal charge. That's one side of the facts. That's what we've just heard. And Wilde is the only person in this case who uses the word fanned, surround, cut off, means of escape. Nobody else talks about that. Because the other side of the facts are that every other witness in this case, including Dr. Swig, has testified twice, once at the criminal trial, once here, in this case in their depositions, that only one person left the pool after Wilde left the pool, and that was Tim Runfola, who's now an analyst with the Homeland Security Administration. Mr. Runfola wanted to talk to him about what was going on with Dr. Swig, and Dr. Swig followed Mr. Runfola. The others followed Dr. Swig without knowing what was going on. And there's clear evidence that... Does that matter? In a way, it does, because... Why does that matter? A police officer doesn't know why they're following him. Let me explain exactly why, because the statutes involved in North Carolina, the obstruction of justice statutes, are all tailored towards the view of the person who is accused of committing the intimidation, not the person who's putatively intimidated. So from the perspective of these people, you have to look objectively at what they were thinking. And only two of them knew what the conversation was about. The others didn't. But one of them, one of these other men, sat on a curb about 50 feet away. Another one sat on a patch of grass about 75 feet away. And then two of them huddled under a tree because it was so hot. And they were all either not wearing any shoes... But they left a cool pool with water in it to go out to the dry parking lot to cool themselves down. No, they were following their... I'm just trying to say, that's what you said. They testified to... Well, police officers, though, it's a little suspicious. Wouldn't you think that to cool off, you leave the pool to go across the parking lot to sit down on the curb in the hot sun with a bathing suit on? I think it's very clear that the people who were there, the men who never surrounded anybody, were sitting there following their friend. Right, they followed their friend. Right. Three of them didn't know what this was about. One of them wasn't even at the pool. Did the police officer know that? I don't know what the police officer actually knew. Exactly, that's my point, though, is doesn't that factor into who's present? If they're 75 feet away, doesn't it factor the presence, their presence, in terms of whether or not you're intimidating? Does it make a difference whether I'm questioning you alone or I'm questioning you with four other friends that are 75 feet away? Does that make a difference if I'm a police officer? A reasonable police officer. Right, right. Does it? I'm asking you, counsel, does it? The answer is no, and I would submit to you that, Your Honor... And you say as a matter of law it would not make a difference. Well, here's the thing. That is for a jury to determine. Wait a minute, wait a minute. I mean, that's what we're dealing with here is the distinction in the jurisdictional determination for qualified immunity between a question of law and a factual question that has to be resolved first before you can reach the legal question. So you can't give us a trial example, I think, to prove that. Right. But to follow the line that Judge Greger was giving you, what are the... To get to the foundational question of whether or not there was probable cause, are there facts in dispute that have to be decided before that determination can be made? I think so because the opposite narrative that every other witness tells does not give rise to probable cause. Probable cause could only plausibly exist under the events as portrayed by Mr. Wilde. And I don't know that the court necessarily concludes that his version of the events would be probable cause under either of the statutes involved, but I think that it's important here, and you need to resolve that factual dispute because every other witness, what they are saying, deprives the events of any probable cause for either of the two crimes charged. Or any crime. I just wanted to ask a question of North Carolina law. You were saying that under North Carolina law, what is determinative is the point of view of the reasonable recipient of the threat or the reasonable intent of the alleged purveyor of the threat. Right. The putative defendant, the accused. The statutes are written, but more importantly, North Carolina courts have interpreted the statutes to be written as prohibiting the conduct, not the result. So to put it that way, maybe it makes sense. It is not material whether... Not even whether a reasonable person would have viewed the situation as threatening, but whether the conduct objectively would... Would what? Whether the conduct... Would reasonably be construed as threatening? The court hangs this analysis on the element of willfulness and intentionality that's in the statute, and what they read that to mean is that the conduct not only has to be threatening, coercive, but it also has to be intended to be. So it's a little different than asking the question whether a reasonable person would be threatened. I think that might be some evidence of an intent, but the question is were these people... Actually, now it's really only Dr. Swick because he's the only one that was charged. Okay, well, let me ask a second part of this. The district court felt, correctly or not, that it had to determine whether or not there were sufficient facts that Wild presented to the magistrate that a jury could find that Wild intentionally or recklessly mischaracterized or omitted material facts in his arrest application, because if so, he couldn't rely on the protection of the magistrate's probable cause determination. Right, and that decision has to be made by a jury because the facts about what occurred and what Wild said occurred, what Wild said occurred and what every other witness said occurred, are diametrically opposite. They are very different. I think Judge Duncan... Her question really helped focus it for me in terms of questioning you about that. You started off saying basically your case is about you think that the officer lied about the circumstances or at least hyperbole, let's say euphemistically, in order to effectuate the warrant. But let's go beyond that. If, I know you're not going to probably concede this, but if it happened just like your client said he did and just like the other people who were involved intended their intentions, if as a matter of law that was sufficient for a reasonable police officer to believe to be threatened as they did, then don't you lose? If that's... Forget about the lying to the magistrate. If it happened just like your client said, as a matter of law, could that mean that that would be enough to make a reasonable police officer feel that he was threatened or intimidated? So take that. That's why I said say and facts. I don't want to remove all that other stuff. Take all the facts just like you said. You said we can't do this as a matter of law. Let me ask a clarifying question. Are you asking me to assume that the facts as told... The facts as true? The facts as told by your client. Right. And the witnesses that agreed with his account. Exactly. It happened just like that. Could I put it to you this way? That if my client and all the other witnesses to the events, their story was different than what it is and instead it was, they took off out of the pool when they saw Officer Wild surrounded his car, taunting him, screaming drop the case or something to that effect, then we would be in a lot of trouble because probable cause defeats at least two of the three constitutional claims before you. And it also would defeat... It would defeat the malicious prosecution. Now answer my question. Why as a matter of law we could never conclude that you would lose under that as a matter of law? Tell me, give me your best arguments why we could not. Because that's really what you were talking about. If the facts are just like your client said, what would prevent us from finding as a matter of law that qualified immunity could be under circumstance a reasonable obstacle that can lead that to be threatened? Why not? First of all, the problem of there has to be a jury determination of the facts. You're asking me to assume that, right? I'm saying as a matter of law why we could not find it. That was enough. Taking the evidence in the light most favorable to us, right? I have, everything. You can't find probable cause that Dr. Swick, Dr. Swick, by engaging a police officer in a polite... We don't look through the lens of your client. We look through the lens of the officer for qualified immunity as whether a reasonable police officer would have, under those facts that you give us, could not have believed that he had probable cause to arrest for intimidation and threatening a witness. That's the question. The reason, there are several, but the first reason is what was the threat? There was no threat. Okay. And beyond just communicating threats, the intimidation statute requires... What about the fact that I'm a police officer, I've effectuated your arrest for a felony, that case is pending, and you're coming to me in a calm fashion saying, what's up with this? Why don't you stop bringing these false charges against me and throwing me under the bus? That itself just being confronted, that's not enough, you say? Of course not, because the First Amendment will prohibit that every time, and it should, because you have a right to express your grievances to the government, and I don't think that there's anything more central to the First Amendment than that, and I don't think that there's a better illustration of that constitutional exercise than asking a police officer directly, calmly, and in a polite fashion whether or not he is engaging in a proper exercise of his authority. That's what happened here, and the First Amendment always will step in, and there is a very important question I hope we'll never reach, and that is, is there a cause of action for retaliatory arrest, even if there's probable cause? I thought more fundamentally, sort of at the threshold level, your position was that the test for intimidation is not dependent on the subjective reaction of the recipient of the alleged threat. Are you backing away from that? No, not at all. That's black-letter North Carolina law. Those are the criminal statutes at issue, and there's a really useful case in that regard. I will find it if I can, but it goes through, I think, 11 different criminal charges based on 11 different conversations and interactions with a witness, and the North Carolina court found only one of them is an actionable charge because of that reason. The remainder, although the person, the punitive victim in the case, the complaining witness in the case, felt and believed that she was being intimidated, that she was being coerced into dropping the charges. The court looked at what the defendant said and did, and that was their focus, and on that basis the court ruled against the state in 10 out of the 11 cases. It's cited in my brief, and I just had it on the top of my mind. The top of your head or the tip of your tongue? That one, too. I do want to, Judge Gregory, you asked a question a long time ago, and I didn't mean not to answer it. I just got sidetracked. No, go ahead. We'll pepper you with a lot of questions. Don't worry about it. Go ahead. But I did want to note that putting yourself, as you did in the officer's position, and wondering if this was... No, I wasn't putting myself. I thought that's what our precedent required us to do if we're going to look at qualified immunity reasonably established, you know, clearly established under the law. Go ahead. Well, I just, in thinking about that, and immediately I turned around and looked, and I think that if we had a measurement and we looked at the depositions of 100 feet and 75 feet, I'm afraid of opposing counsel in so many ways, but I don't think he's going to hurt me, and he's about 10 feet away, and I know he's not going to hurt you and the people in the spots behind the bar are about where the other men were in this case, sitting on curbs and grassy spots. You would agree that your client, although calm, was confrontational? No, and I'll tell you... You don't concede that? You know, tell me what you mean by confrontational. What I mean by this, you're telling a police officer, in so many words, you're a liar and you're unprofessional because what he said was, when are you going to stop bringing these false charges against me and throwing me under the bus? Isn't he saying that you're a liar and you're unprofessional? That's got to be confrontational if you whispered it. The words are not the same. If he did say, you're a liar... Isn't that the effect of it? Well, you know, words are important things. Very important words. It does matter, but ultimately, you look at the testimony and we've cited it, and I can give you references here, but the collective testimony of the witnesses is very similar. They all testify that he's about 6 feet away, 5 to 6 feet away, that neither one of them looked agitated until Officer Wilde at the end appears to be agitated and says, I'm done, I'm done talking to you, and Dr. Swick says, okay, and goes away. And that's the end of it. And again, I can't emphasize enough how important the First Amendment is in protecting what happened there, because if it doesn't, where do you go and what do you do? I mean, I think that that is the reason for it, for that protection, and I think it was a vivid example of exactly what that amendment protects, right or wrong. And confrontational, I just, I think he could have been more confrontational and he wasn't, and that's why I don't leave it accepting that as a characterization. That's all. But I would imagine it'd be fair, although the witnesses did reject that as a characterization. My time is up. Thank you very much, Mr. Espaillat. Thank you. Mr. Hardzak, you have a brief amount of time. It was confrontational and it was intimidating, and one of the elements of the witness intimidation statute is that the witness was intimidated, and clearly the witness here was intimidated. Carlos Alvarado, the best friend of the plaintiff, Dr. Schwick, says that he could see how it would have been intimidating. He said that the criminal trial and he said that the indemnification. How are you viewing the facts in the light most favorable to Schwick as you would have to do? Because I don't disagree with what Schwick says he did. The perception of it, the manner in which he did it, when you've been drinking at the pool all day and you follow a guy 100 yards and you say, I want to talk to him mano a mano, and you've got four more manos coming behind you, and he says that was not a coincidence. I asked him, was that a coincidence? They just happened to be coming? He said, no, it wasn't. They were all going down there, and they want to say, oh, they weren't following Wilde. Well, they were following Wilde, and they said they were, and they all admitted they were. Well, what about the finding, the contention that Wilde intentionally or recklessly mischaracterized or omitted material facts in his warrant application? Well, he clearly did not. It just didn't happen. In fact, Judge Schroeder found there was no fabric, no evidence of fabrication here. He dismissed the concealment claim. I mean, I think, again, it's a little bit of just cement. He found that Schwick presented facts so different from Wilde's version that a genuine dispute of material fact exists whether Wilde deliberately or recklessly misstated the facts to the magistrate when applying for Schwick's arrest warrant. In fact, if Schwick's version of the events is believed, the facts fail to provide a basis for an officer to reasonably conclude that Schwick and his friends engaged in the felony of intimidation or attempted intimidation within the meaning of the statute. Well, I think they did because they can do it by any means, and I think that it is certainly not a clearly established right that you can intimidate a witness, and the fact that there is not a case that I've seen where intimidation of a witness on body language and the way you act in some other manner has been brought forth, and so I think that at a minimum, Officer Wilde is entitled to qualified immunity on that point, and he does have probable cause, which establishes his right to qualified immunity, and it was backed up all the way to the jury trial in the criminal court. Mr. Hodgson, that is, counsel raised a very important question, and I mean answer. He said that the First Amendment is what gives his client the right to say, Mr. Police Officer, I want to talk to you about the way you're conducting your duties. What's wrong with that under our system of government? There is absolutely nothing wrong with his exercising the First Amendment right, but the way he chose to do it in doing this intimidating stalk out from the pool is not the way you do it because that's bordering on, that appears to be criminal activity in the mind of the officer, and that's where he goes to the magistrate, and you do not have a clearly established right to be intimidating to an officer, and I think that officer has the right then to go, and he could have, like I said earlier, he could have arrested him on the spot, but he took the time to go to his supervisor and discuss it. He went to the magistrate. The supervisor went to the magistrate. He went back to the magistrate. They go to the prosecutor, the judge, the jury. Mr. Wilde, according to the district court, also did not disclose to the magistrate that he knew three of the five men as friends and or acquaintances, including Schwick himself, and that he knew they were also friends of his girlfriend. Wilde omitted these details. It's not relevant, leaving the impression that he was confronted by strangers, an unknown person he charged in that person's gang. I don't think he ever said they were strangers. You know, that's just not, I mean, it's just maybe it was a fact that was omitted, but he probably didn't, you know, there were probably lots of things that he didn't tell them about what color of the bathing suit they were wearing. I mean, they're just things that don't matter. That doesn't matter. You could be threatened by friends. And the fact that there was a relationship, a preexisting relationship, wouldn't matter? A relationship between these people? There was no relationship between James Wilde and Lance Schwick. There was no relationship. He knew him, he'd met him, and he met one of the other guys, and that's all that he knew. And he knew on that day that they were, you know, confronting him in this fashion, and I think once he goes through these steps that he took the time to go through, that really, under the Evans case, that really breaks the chain. He goes on and the prosecutor gets involved at that point, the judge gets involved at that point, the court gets involved at that point. He really, you know, should be in the clear for qualified immunity, in this case, in my opinion, in public official immunity. And, you know, I do not think there is any dispute about this. In the criminal trial, the plaintiff agreed with the following statement. You took it upon, this is the prosecutor asking him the question, Mr. Schwick, you took it upon yourself and four of your friends, after you had had some drinks, to go surround him at the back of his car and confront him about these pending charges in his position as a witness. And he agreed with that. I thought that Wilde did know three of the five men as friends and or acquaintances, including Schwick himself. I don't remember. I think he had met Schwick, he knew Schwick, and I think he knew Carlos Alvaredo, who was the maintenance man at the apartment complex. I do not believe that he knew the other people, and if there's something the record says he did, I apologize. I don't recall that being the case. Okay. The district court has record sites for that characterization. I don't believe that came from Officer Wilde, but, again, I could be corrected on that. But I don't think it's relevant. I don't think it matters. I don't think it's a material fact. I think he was being intimidated as a witness, and that's what he did. And, again, I think that the fact that this man took the time to go and get a warrant and go through all this, when he could have arrested him, he's now being sued for these three or four or five claims now, where if I were him next time, I would arrest the guy. I wouldn't go get a warrant, if this is what he's going to get. Thank you very much. Thank you very much. We're going to ask the deputy to adjourn the court sanity die. We're going to come down to Greek Council, and then we invite you to stay for a session of Q&A after the court is officially adjourned. Thank you.
judges: Roger L. Gregory, Allyson K. Duncan, G. Steven Agee